IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

JAMES D. MOCK, a single person,    )
DANELLE BAME on behalf of minor     )
child J.B. (DOB 06/09/01), a single    )    No. 76097-1-I
person, and LINDA and TOM RYAN,    )
a married couple,                              )    DIVISION ONE
                                                 )
                    Appellants,               )
                                                 )
        v.                                       )
                                                 )
THE STATE OF WASHINGTON, by     )    PUBLISHED OPINION
and through its DEPARTMENT OF      )
CORRECTIONS, STATE OF             )    FILED: October 2, 2017
WASHINGTON (DOC),                    )
                                                 )
                    Respondent.               )
_____)

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2017 OCT -2 AM 10: 46

BECKER, J. — Plaintiffs were injured in an armed attack by an offender who

was serving a term of community custody under supervision by the Department

of Corrections. The issue is whether the department can be held liable for failing

to report the offender's previous community custody violations to the court.

Summary judgment was properly granted to the department. Under applicable

statutes, sanctions for community custody violations are imposed by the

department in an administrative process, not by the court.

This case was dismissed on summary judgment. Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Hertog v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). We make the same inquiry as the trial court. Hertog, 138 Wn.2d at 275. The facts and reasonable inferences are considered in the light most favorable to the nonmoving party. Hertog, 138 Wn.2d at 275. Questions of law are reviewed de novo. Hertog, 138 Wn.2d at 275.

## FACTS

John McKay was in his forties when he was convicted of felony harassment for threatening to kill his wife. It was his first criminal conviction. After serving several months in jail, he was released in June 2012 to begin serving a 12-month term of community custody under the supervision of the Department of Corrections. Community corrections officer Mark Deabler was assigned to supervise McKay.

McKay was ordered to have no contact with his wife. On June 27, 2012, the first day of supervision, Deabler and other officers contacted McKay's wife to make sure McKay was not violating the no-contact order. The chronological entries in McKay's case file include a note from that day documenting "lots of red flags" disclosed by McKay's wife. She reported they were ending a 20-year marriage, McKay was a long-time alcohol user, he was on disability and not working, he had "burned all his bridges" with family, he was asking third parties about her and making threats to kill her and to commit suicide, he talked about "'shooting cops,'" he was trained in martial arts, and he had access to firearms

2

through family. He had been to treatment twice, but it "sounds like he drinks all day."

On July 9, 2012, McKay committed a new offense. Intoxicated, he drove to the home of family friends and demanded to know where his wife was. When they did not tell him, he repeatedly rammed his van through their garage doors, causing extensive damage to the cars inside. Police arrested McKay for investigation of malicious mischief and booked him into jail.

The garage-ramming incident was not only a criminal offense, it was also a violation of the terms of McKay's community custody sentence. In 2009, the legislature made the administrative process outlined in RCW 9.94A.737 the exclusive enforcement mechanism for violations in cases like McKay's, with exceptions not relevant here. RCW 9.94A.6332(7) ("if the offender is being supervised by the department, any sanctions shall be imposed by the department pursuant to RCW 9.94A.737"). Reporting violations to the court is not part of the administrative process that is currently in effect.

If an offender is accused of committing a high level violation of a condition or requirement of community custody, the department may sanction the offender to not more than 30 days in total confinement after an administrative hearing. RCW 9.94A.737(4). Deabler considered the garage-ramming incident to be a high level violation. He described McKay's adjustment to supervision as "nonexistent." At Deabler's request, a hearing officer imposed the maximum 30 days of confinement.

3

While McKay was in jail for the 30-day sanction, his wife tried to serve him with divorce papers. McKay reportedly tried to call his wife, in violation of the no contact order. Deabler wrote in an internal e-mail that he hoped the prosecutor would file charges against McKay "and not let him out."

On July 12, 2012, the King County prosecutor filed a felony charge of malicious mischief against McKay for the garage-ramming incident. A high bail was set. McKay was unable to pay it, and he remained incarcerated.

The standard sentence range for the malicious mischief charge was three to nine months. McKay negotiated a plea bargain that allowed him to request a drug offender sentencing alternative. The sentencing court accepted the guilty plea on September 18, 2012. By order of the court pursuant to RCW 9.94A.660, the department provided the summary of a chemical dependency examination report on McKay. McKay was assessed as alcohol and drug dependent and likely to continue committing crimes while under the influence. He admitted he had hit "rock bottom" and needed treatment. According to the report, a certified residential treatment provider in Chehalis could make a bed available for McKay beginning on November 5, 2012. McKay's parents agreed to provide a clean and sober living environment for him until that date.

On September 28, 2012, the court sentenced McKay to a treatment-based residential sentence of three to six months. See RCW 9.94A.660 (drug offender sentencing alternative). As a condition of sentence, McKay was to reside with his parents and report for supervision by the department until he entered treatment.

Deabler was not informed of the guilty plea and did not know that McKay was requesting a treatment sentence. After the judgment and sentence was entered, Deabler received an e-mail advising him that McKay had been released from jail and was expected to report to the department for supervision.

Deabler knew McKay posed a significant danger to his estranged wife and the people around her. To Deabler, the similarity between McKay's two convictions showed he had an "offense cycle" involving consumption of alcohol followed by threats. Deabler told a colleague that he would require McKay to report frequently until November 5 and "my guess is he won't make it that far before being arrested but we will see."

McKay was seen by community corrections officers 21 times in the month of October—much more frequently than the department's standard policy required. During these contacts, the officers periodically administered breath and urine tests. They inspected logs to verify that McKay was attending Alcoholics Anonymous meetings 3 times a week as they directed. They made an unscheduled home visit to verify that McKay was living with his parents. During these weeks, Deabler had no reason to believe McKay was drinking or violating other conditions of supervision.

At some point in October, McKay's estranged wife, accompanied by her boyfriend, James Mock, had what seemed to be a chance encounter with McKay in a hardware store. She had not seen McKay for months. McKay asked her if she was going to divorce him, and she answered "probably." McKay's wife was frightened, but she did not report the contact to police.

5

When Deabler saw McKay on Friday, October 26, McKay was still in compliance with all conditions of community custody. That evening, while out having dinner with his sister, McKay saw his wife across the street dressed up as if for a date. Over his sister's objections, McKay followed his wife and became convinced she was dating someone else.

On the morning of October 27, 2012, McKay stole his nephew's guns and drove to his wife's home. He shot at his wife and missed her. He shot Mock and kidnapped Mock's 11-year-old son. He drove to the home of his mother-in-law, Linda Ryan, and shot her too. Police found McKay some hours later, slumped over his steering wheel and holding a gun. He had committed suicide.

The plaintiffs—Mock and his son J.B., and Ryan and her husband—brought this lawsuit against the department. They alleged Deabler was negligent for failing to make a report to the court that sentenced McKay on September 28. Plaintiffs concede that during the month of October, before the attacks, McKay did not commit any violation for which the department could have sanctioned him. In their view, Deabler should have known when McKay was going to be sentenced on the new charge and should have informed the sentencing court of the reasons why he regarded McKay as at risk to commit more acts of domestic violence. Plaintiffs submitted the opinion of an expert witness that if the sentencing court had received such information, the court would not have released McKay from jail until he entered the treatment facility. In that event, McKay would not have been free to attack the plaintiffs on October 27.

Both parties moved for summary judgment. The court granted the department's motion. The plaintiffs appeal.

## IMMUNITY

We first consider the department's claim to absolute immunity. Immunity is a question of law we review de novo. Hertog, 138 Wn.2d at 275.

An immunity "frees one who enjoys it from a lawsuit whether or not he acted wrongly." Richardson v. McKnight, 521 U.S. 399, 403, 117 S. Ct. 2100, 138 L. Ed. 2d 540 (1997). Absolute immunity, where it exists, protects the State as well as its agents. Gilliam v. Dep't of Soc. & Health Servs., 89 Wn. App. 569, 576-77, 950 P.2d 20, review denied, 135 Wn.2d 1015 (1998). "Absolute immunity necessarily leaves wronged claimants without a remedy. This runs contrary to the most fundamental precepts of our legal system. Therefore, in determining whether a particular act entitles the actor to absolute immunity, we must start from the proposition that there is no such immunity." Lutheran Day Care v. Snohomish County, 119 Wn.2d 91, 105, 829 P.2d 746 (1992), cert. denied, 506 U.S. 1079 (1993).

Judges are absolutely immune from civil damages suits for acts performed within their judicial capacity. Taggart v. State, 118 Wn.2d 195, 203, 822 P.2d 243 (1992). Therefore, the judge who sentenced McKay on September 28, 2012, is immune from liability for the decision to release McKay pending treatment. Judicial immunity extends to witnesses, prosecutors, and other participants at judicial hearings. Bruce v. Byrne-Stevens & Assocs. Eng'rs, Inc., 113 Wn.2d 123, 125, 776 P.2d 666 (1989); Gilliam, 89 Wn. App. at 580.

Therefore, the prosecutor and the McKay family members who spoke at the sentencing hearing are immune from liability for failing to argue that McKay should not be released. If Deabler had submitted a presentence report or testified at the sentencing hearing as a witness, he too would be immune under Bruce. But Deabler did not attend the hearing. No one asked him to attend, and his job did not require it.

Judicial immunity also extends to actors of governmental agencies who perform quasi-judicial functions, for example, the parole board. Taggart, 118 Wn.2d at 204. Some of the functions of the department are identified by statute as quasi-judicial: "In setting, modifying, and enforcing conditions of community custody, the department shall be deemed to be performing a quasi-judicial function." RCW 9.94A.704(11). The immune functions of setting, modifying, and enforcing conditions of community custody are carried out administratively within the department. See RCW 9.94A.737. Deabler's alleged negligence—failure to report to the court—did not occur in the exercise of the quasi-judicial functions identified by RCW 9.94A.704(11). Therefore, the department is not immune under the statute.

The department argues that because Deabler would have immunity from suit if he *had* made a report to the court, he must also have immunity from suit for failing to do so. The only case the department cites in support of this proposition is Tibbits v. Department of Corrections, 186 Wn. App. 544, 346 P.3d 767 (2015).

In Tibbits, an employee of the department modified the offender's community custody conditions by allowing him to travel unescorted to a treatment

facility outside the county. <u>Tibbits</u>, 186 Wn. App. at 549. Instead of reporting to treatment, the offender committed a crime. <u>Tibbits</u>, 186 Wn. App. at 546. The victim sued the department. The department was held to be immune under RCW 9.94A.704(11) because the department's alleged negligence—allowing unescorted travel—was committed in the exercise of a quasi-judicial function, i.e., modifying the conditions of community custody. Only the most tortuous reading of <u>Tibbits</u> would interpret it as holding that immunity for performing a quasi-judicial function applies equally when the actor is not performing a quasi-judicial function.

We reject the department's claims to witness immunity and immunity under RCW 9.94A.704(11).

## DUTY

The plaintiffs state their theory of the case as follows: The department, "even if unasked, was under an independent common law duty to report its material knowledge of McKay's behavioral violations to the court."[1] Plaintiffs say this common law reporting duty "provides the sentencing or releasing court material information and the opportunity to protect the public by not releasing, as in this case, a homicidal felon upon the public."[2]

The common law duty owed by community custody officers is not an obligation to take a specific action such as reporting an offender's violations to a

---

[1] Brief of Appellant at vi.
[2] Brief of Appellant at 22.

sentencing court.[3] The duty, as recognized and adopted by our Supreme Court in Taggart, is the duty stated in general terms by the *Restatement (Second) of Torts* § 319 (1965): "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Taggart, 118 Wn.2d at 219.[4]

Existence of a duty is a question of law. Hertog, 138 Wn.2d at 275. Generally an actor owes no duty to control the conduct of a third party so as to prevent him from causing harm to another. Bishop v. Miche, 137 Wn.2d 518, 524, 973 P.2d 465 (1999); Nivens v. 7-11 Hoagy's Corner, 133 Wn.2d 192, 199, 943 P.2d 286 (1997). Such a duty may, however, arise if a special relationship exists between the actor and the third party. RESTATEMENT § 315(a). "Once the relationship is created, it is the *relationship* itself which ultimately imposes the duty upon the government." Joyce v. Dep't of Corr., 155 Wn.2d 306, 318-19, 119 P.3d 825 (2005). The section 319 duty—also referred to as the "take charge" duty—is imposed only when there is a "'definite, established and continuing relationship between the defendant and the third party.'" Taggart, 118 Wn.2d at

---

[3] Cf. Nivens v. 7-11 Hoagy's Corner, 133 Wn.2d 192, 205-06, 943 P.2d 286 (1997). In Nivens, the court recognized the common law duty of protection arising from the special relationship between a business and its invitee. The court rejected the plaintiff's proposal that a business owes a free-floating general duty to provide security personnel to prevent criminal behavior on the business premises.

[4] A statute provides that the department will be liable only for gross negligence by community corrections officers. RCW 72.09.320. The distinction between gross negligence and ordinary negligence is not important here because the standard of care is not at issue.

219, quoting Honcoop v. State, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988). It has been imposed on community corrections officers as well as parole officers and probation officers. Joyce, 155 Wn.2d at 320; Taggart, 118 Wn.2d at 224; Bishop, 137 Wn.2d at 528-29, 531.

Appellate opinions occasionally refer to a "duty to report" to a court. See, e.g., Bishop, 137 Wn.2d at 528 ("duty to supervise [the probationer] and report to the court if he failed to comply"); Hertog, 138 Wn.2d at 279 (city probation officer "has a duty to report violations to the court"). The plaintiffs interpret these references as signifying that community corrections officers owe a free-floating, ever-present common law "duty to report to the court" the dangerous propensities of the offenders they are supervising. That interpretation is incorrect. When a phrase like "duty to report" is used, it serves as shorthand for a determination that (1) a special relationship existed giving rise to a section 319 duty to prevent harm and (2) the terms defining the relationship in the particular case required the "take charge" official to report to the court. For example, in Bishop, the probation manual required probation officers to report violations of probation conditions to the court. Bishop, 137 Wn.2d at 522, 531. In Hertog, the city probation officers did not have the power to revoke probation; they had to seek revocation by the court. Hertog, 138 Wn.2d at 279.

Whether the department owed plaintiffs a section 319 duty actionable in the circumstances of this case depends on the terms defining Deabler's relationship with McKay. See Bishop, 137 Wn.2d at 528 ("The relevant inquiry is the relationship of the officer with the parolee.") Statutes and conditions of

sentence are relevant to this inquiry. Taggart, 118 Wn.2d at 219; Bishop, 137 Wn.2d at 528-29, 531; Joyce, 155 Wn.2d at 317, 319-20. The tort of negligent supervision is not unlimited. If the department "is not authorized to intervene, it cannot have a duty to do so." Couch v. Dep't of Corr., 113 Wn. App. 556, 569, 54 P.3d 197 (2002), review denied, 149 Wn.2d 1012 (2003); Joyce, 155 Wn.2d at 320 n.3.

Joyce was decided in 2005 before the 2009 statutory change discussed above. In the previous statutory scheme described in Joyce, the department "maintained a definite, established, and continuing relationship by assigning a community corrections officer to monitor and to *notify the judge* if [the offender] failed to substantially comply with the court's conditions of release." Joyce, 155 Wn.2d at 320 (emphasis added). That statutory scheme is no longer in effect. The department's administrative process is now the exclusive process for dealing with violations by offenders like McKay. RCW 9.94A.737.

Unlike his counterparts in Bishop, Hertog, and Joyce, Deabler was not expected to notify the court when McKay committed violations. No statute required him to do so. Only if McKay was *not* being supervised by the department would a court have the authority to impose sanctions for a violation. RCW 9.94A.6331(1); State v. Bigsby, ___ Wn.2d ___, 399 P.3d 540 (2017). Deabler fulfilled his statutory role by reporting McKay's violation to the department and recommending the maximum 30-day sanction.

There is no evidence that the department, in supervising McKay, failed to comply with statutes or with court directives. When McKay requested a

treatment sentence on the new charge of malicious mischief, the department provided the court with a chemical dependency screening report. RCW 9.94A.500(1). The court had the discretion to ask the department for a risk assessment or presentence report concerning McKay, RCW 9.94A.500(1), but because the court did not ask, the department did not breach a duty by failing to provide one. And this was not a situation in which the department was required to provide the court with a presentencing risk assessment under RCW 9.94A.501(7).

We will assume that Deabler could have discovered the terms of the plea bargain, could have put the sentencing date on his calendar, and could have reported his concerns about McKay to the sentencing judge either in writing or by appearing at the sentencing hearing as an uninvited witness. We will further assume Deabler would have told the court that McKay had dangerous propensities toward domestic violence and was likely to act on them unless kept in jail pending his entry into treatment. But Deabler's *duty* to prevent McKay from harming others existed only to the extent of his special relationship with McKay. The terms of that relationship did not require him to give the court or the prosecutor unasked-for advice about how to sentence McKay. A reporting obligation was not imposed on Deabler by the relevant statutes, by McKay's sentence conditions, or by any order of the court. In hindsight, Deabler was one of many people who theoretically could have recommended against releasing

McKay or taken other steps that might have prevented McKay's criminal attack on the plaintiffs. But having the opportunity to prevent another's criminal conduct does not by itself impose a duty to do so.

In summary, the department is not immune from this suit. Nevertheless, the trial court properly dismissed plaintiffs' claim that the department's community corrections officer owed a duty to report concerns about McKay's dangerous propensities to the sentencing court.

Affirmed.

_Becker, J._

WE CONCUR:

_Mann, J._                    _Verellen, J._